**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


**JOHN ORANE HUDSON,**

      **Plaintiff,**

**vs.**                              **Case No.  4:12-CV-494-WS/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review

of the final determination of the Commissioner of the Social Security Administration

(SSA) denying Plaintiff's application for Supplemental Security Income (SSI).  After

careful consideration of the entire Record, it is respectfully recommended that the

decision of the Commissioner be affirmed.

**I.  Procedural History of the Case**

On March 27, 2008, Plaintiff, John Orane Hudson, filed a Title II application for a

period of disability and Disability Income Benefits (DIB), and a Title XVI application for

SSI, R. 127-36, and filed another SSI application on November 24, 2008,

R. 137-39, alleging disability beginning on January 1, 2005, due to HIV infection, vision problems, and headaches.  R. 159.  (Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)  At hearing, Plaintiff amended his onset date to August 27, 2007.  R. 41, 126, 226, 230.  Plaintiff's date last insured, or the date by which his disability must have commenced in order to receive DIB under Title II, was March 31, 1996.  R. 28.

Plaintiff's March 27, 2008, SSI and DIB applications were denied on June 19, 2008.  R. 28, 70-77.[1]  Plaintiff's November 24, 2008, SSI application was denied initially on February 5, 2009, and upon reconsideration on April 24, 2009.  R. 28, 78-84.  On June 8, 2009, Plaintiff requested a hearing.  R. 28, 85.

"By an undated letter (received on July 12, 2010), the claimant's representative requested reopening of the prior applications filed on March 27, 2008; and, further requested to amended the alleged onset date to August 27, 2008 (Exhibit 16B)."  R. 28. The Administrative Law Judge (ALJ) granted this request.  *Id*.

On July 12, 2010, Plaintiff's representative submitted a brief.  R. 226-30; *see infra* n.2.  On July 13, 2010, Plaintiff appeared and testified at a hearing conducted in Tampa, Florida, by ALJ Dores D. McDonnell, Sr.  R. 28, 38-64.  Plaintiff was represented by Liz Montefu, a non-attorney representative.  R. 20, 22, 28, 94-96.

---

[1]  Plaintiff states that this appeal addresses only his claim for SSI filed in March 2008 and further states that "it is the evidence on and after the date of the application which is most relevant to evaluating whether the ALJ in this case appropriately denied benefits."  Doc. 13 at 3 n.1.  In light of the amended alleged onset date of August 27, 2007, which is after the date last insured, Plaintiff states that this action "must be considered a tacit withdrawal of the DIB claim."  *Id*.; *see* R. 235 (brief to Appeals Council dated March 21, 2012, from Plaintiff's representative explaining withdrawal of DIB claim).

On July 30, 2010, the ALJ issued a decision and denied Plaintiff's applications for

SSI benefits filed on March 27, 2008, and November 24, 2008, concluding that Plaintiff

was not disabled.  R. 28-37.  On September 13, 2010, Plaintiff requested review of this

decision, which the Appeals Council denied on June 12, 2012.  R. 6-11, 21-24.

(Plaintiff's representative provided the Appeals Council with a brief dated March 21,

2012, R. 232-35, and medical records (new evidence) from Hillsborough County

Specialty Clinic dated January 20, 2010, to June 7, 2010 (April 19, 2010, May 17, 2010,

and June 7, 2010 (dates of mental health evaluation and treatment)).[2]  R. 563-68.  The

Appeals Council stated in its notice:

> The [ALJ] considered and evaluated the evidence and reaches an
> appropriate conclusion on the issues in your case.  In reviewing your
> case, we considered the reasons you disagree with the decision.
> Specifically, we considered the statements and contentions in your
> representative's brief (Exhibit 17E).  After carefully reviewing the
> evidence of record in your case, the Appeals Council concludes that
> the [ALJ's] decision finding that you are not disabled is supported by
> substantial evidence.
>
> We found that this information does not provide a basis for changing the [ALJ's]
> decision.

R. 6-7.  The ALJ's decision stands as the final decision of the Commissioner.

On September 20, 2012, Plaintiff filed a Complaint with the United States District

Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of

law, docs. 13 and 17, which have been considered.

---

[2]  As noted above, Plaintiff's representative submitted a brief to the ALJ the day
before the hearing.  R. 226-30.  The representative refers to records from the
Hillsborough County Health Department from 2010 as "new evidence."  R. 227-28.
There is also a reference to Plaintiff receiving mental health services from Kenneth
Kavanagh, ARNP-C, MSN, MPH, who was reported to be on vacation and whose
records were requested.  R. 227, 229.  Mr. Kavanagh's name was also mentioned
during the hearing.  R. 40, 64; *see also* doc. 13-1, Jan. 30, 2013, letter, regarding
difficulty obtaining health department records.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant has not earned sufficient Quarters of Coverage to meet the 20/40 rule, and therefore has not met the insured status requirements of the Social Security Act." R. 30.

2. "The claimant has not engaged in substantial gainful activity since August 27, 2007, the amended alleged onset date." The ALJ found that although Plaintiff worked in 2009 after his alleged onset date, his work activity did not amount to substantial gainful activity. *Id.*

3. "The claimant has the following severe impairments: osteoarthritis of the right knee and HIV." *Id.* The ALJ also found that Plaintiff's complaints of headaches and decreased vision are not severe and "complaints of adjustment disorder, anti-social personality disorder, history of substance abuse, asthma, hypertension, peripheral neuropathy, headaches, generalized pain, do not cause more than minimal limitation in the claimant's ability to perform basic work activities" and also non-severe. R. 31. The ALJ considered the four broad functional "paragraph B" criteria in Listing 12.00, and ultimately determined that Plaintiff had *no* limitations in activities of daily living and in social functioning; *mild* limitations in concentration, persistence or pace, although "[u]pon examination, the claimant's intellectual functioning is estimated to be within the average range, but his judgment and insight appeared to be impaired"; and *no* episodes of decompensation which have been of extended duration. The ALJ determined that Plaintiff's "medically determinable mental impairment causes no more than "**mild**" limitation in any of the first three functional areas and "no episodes of decompensation which have been of extended duration in the fourth area. The ALJ emphasized "that the claimant reported that he had no history of mental health treatment. Additionally, both State Agency psychological consultants found the claimant's mental impairment to be non severe." R. 31.

4. "The claimant does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 32.

5. "[T]he claimant retains the residual functional capacity [RFC] to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can lift and carry 10# frequently and 20# occasionally. He can sit, stand and walk 6 hours in an 8 hour work day. He has no limitations in his ability to push-pull with hand or foot controls. He has no manipulative, visual, communicative, postural or environmental limitations. He can hear, understand, remember and carry out simple routine work instructions, and

can interact appropriately with co-workers, supervisors and the general public." R. 32.

6. "The claimant has past relevant work in heavy construction, and as a forklift operator." R. 35.

7. "The claimant was born on July 25, 1965 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date." (Plaintiff was 41 years of age on the amended alleged onset date of August 27, 2007.) R. 28, 36.

8. "The claimant has a limited 10th grade education and is able to communicate in English." R. 36.

9. "Considering the claimant's age, education, work experience and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 36. "Based on a [RFC] for the full range of light work, considering the claimant's age, education, work experience, a finding of 'not disabled' is directed by **Medical-Vocational Rule 202.17**. Even assuming for argument's sake that the claimant's past relevant work was semi-skilled or skilled, a finding of 'not disabled' would be directed by **Medical-Vocational Rules 202.18 and 202.19**." *Id.*

10. "The claimant has not been under a disability as defined in the Social Security Act, from the alleged onset of disability on August 27, 2007, through the date of this decision." *Id.*

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the

evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision.  <u>Moore</u>, 405 F.3d at 1211.[3]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"  <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); <i>see</i> 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months.  <u>Barnhart v. Walton</u>, 535 U.S. 212 (2002).  42 U.S.C. § 423(d)(1)(A)

---

[3]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

quite clearly requires that it is the impairment only which must last for a continuous period.  Normally, of course, when a claimant has an impairment severe enough to prevent him from working, he will be unable to work for as long as the impairment lasts.  This is particularly true when the impairment is physical.  The statute, however, does not *require* that a claimant be unable to engage in work during the entire 12 month period.  *See also* 20 C.F.R. §§ 404.1505(a); 404.1509; 404.1510.  The ability of a claimant to engage in work for limited periods of time certainly calls into question the severity of the impairment, but it does not necessarily determine whether the impairment, however, severe, has lasted for at least 12 months.

While a claimant need only show that an alleged impairment has lasted or can be expected to last for the 12 month period to meet the duration requirement, a claimant alleging a mental impairment may face a difficulty not presented in cases involving physical impairment.  As one court has stated,

> While the mere existence of symptom-free periods may negate a finding of disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of the claim.  Unlike a physical impairment, it is extremely difficult to predict the course of mental illness.  Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse.  Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.

*Lebus v. Harris*, 526 F.Supp. 56, 61 (N.D. Cal. 1981).

Because of such considerations, the courts which have considered the question have concluded that a claimant whose claim is based on a mental condition does not have to show a 12 month period of impairment unmarred by any symptom-free interval. . . .  We agree with the assessment of these courts.  A finding that a claimant has a mental impairment which manifests itself from time to time over a long-term period is not inconsistent with the language of the statute, which requires that an impairment last "for a continuous period of 12 months.". . . . Of course, as required by the regulations, the claimant must present medical evidence which indicates that his mental condition is a long-term problem and not just a temporary setback.

Singletary v. Bowen, 798 F.2d 818, 821-22 (5th Cir. 1986) (citations omitted).  *See*

Lane v. Astrue, No. 1:09CV00159-MP-AK, 2010 U.S. Dist. LEXIS 75846, at *28-30

(N.D. Fla. July 28, 2010) (citing Singletary).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 416.920(a)(4)(i)-(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 416.920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear. 20 C.F.R. § 416.927. When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion as "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors. 20 C.F.R. § 416.927(b) & (c).

## IV. Legal Analysis

### A. Issues for Determination

Plaintiff argues that the ALJ erred in not explicitly stating the weight he assigned to the consultative psychological examiner's (Dr. Earl Teller's) opinion which, according to Plaintiff, was contrary to the ALJ's finding that Plaintiff did not a have a severe mental impairment; that Dr. Teller's opinion described at the very least a severe mental impairment, which should have been included in the RFC finding; and even non-severe impairments should have been included in forming the RFC finding. Doc. 13 at 2, 5-10. Plaintiff also argues that the evidence submitted to the Appeals Council was material and should have caused the Appeals Council to remand the matter to the ALJ because it directly contradicted the ALJ's statement in support of the non-severity finding that Plaintiff had no history of mental treatment and established a level of impairment consistent with that described by Dr. Teller. *Id.* at 10-13.

The Commissioner argues that substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not significantly limit his ability to perform basic work activities and were therefore non-severe, remand for further consideration of Dr. Teller's opinions is unnecessary because Dr. Teller did not opine that Plaintiff had significant mental functional limitations, the ALJ did adequately consider Dr. Teller's opinions, and the additional evidence presented to the Appeals Council was not material to the disability determination.  Doc. 17 at 11-22.

### B.  The Evidence

### 1.  Plaintiff's Background, Vocational Factors, and Self-Reported Activities

Plaintiff was 39 years old on the original alleged onset date and 41 years old on the amended alleged onset date, considered a "younger person," under age 50. 20 C.F.R. § 416.963(c).  Plaintiff completed the 10th grade, R. 36, 164, and previously worked, among other jobs, as a forklift operator and delivered phone books.  R. 36, 178, 193-95.  Even though he allegedly became disabled in August 2007, Plaintiff earned approximately $9,000 making deliveries in 2009, although the ALJ did not consider these earnings as substantial gainful activity earnings.  R. 30, 57, 140-53.

During the relevant period, Plaintiff lived with a female friend.  R. 43.  Plaintiff cared for his personal needs independently, prepared meals, handled his own money, shopped for items in stores alone, and performed household chores, but "can't do much in cleaning the bathroom because of the chemicals."  R. 53; *see* 170, 172.  On his questionnaire, he indicated he had no problems concentrating or finishing tasks, although he says he has a hard time concentrating when working and grocery shopping. R. 57, 170.  He says "my friend is taking care of everything for me."  R. 57.  He attended

church every other Sunday.  R. 57.  Plaintiff reported that he spent most of his time

either sleeping or watching television.  R. 172.  He also says he does not drive or do the

grocery shopping.  R. 56-57.

### 2.  Relevant Medical Evidence

The Record includes medical records from Hillsborough County Jail from April

22, 2002, to February 28, 2005, and from the Florida Department of Corrections,

Reception and Medical Center from March 1, 2004, to July 26, 2007.  R. 270-368.

Medical histories are routinely included in these records.  The results from a March 4,

2005, "Initial Psychological Screening," indicated that Plaintiff's mental status was within

normal limits.  R. 366-67.  He appeared to be in no acute mental health distress and

reported no need for psychiatric treatment and his remote and immediate memory

appeared intact.  R. 366.

In December 2007, an examiner from Pinellas County Jail noted that Plaintiff was

alert and oriented to person, place, time, and situation.  Plaintiff complained of asthma

and high blood pressure and a headache, but no problem with breathing or asthma at

this time.  R. 372.  Generally, examiners at Hillsborough County Health Department

Specialty Care Center noted that Plaintiff appeared well-developed, well-nourished

although overweight at times, without neurological deficits, with full range of motion,

often reporting feeling good, alert, and oriented to person, place, and time during visits

between April 2008 and June 2010.  R. 376, 378, 415, 417, 419, 421, 436, 438, 440,

490, 492, 494, 496, 517, 519, 521, 523, 525, 527, 529, 531, 533, 535.  Some of these

records from January 20, 2010, to June 6, 2010, and from the Hillsborough County

Health Department Specialty Care Center, R. 488-99, have particular relevance in light

of the contemporaneous records from the Hillsborough County Specialty Clinic submitted to the Appeals Council *after* the ALJ's decision.  R. 563-68; *see infra* at 17-19.

On June 9, 2008, consultative examiner Bhupendra Kumar Gupta, M.D., performed a disability evaluation under Social Security.  R. 393-400.  He reported that Plaintiff's general appearance, personal hygiene and nutrition were good.  R. 394.  There was no evidence of joint tenderness, swelling, erythema, heat, crepitus, and deformity, except for evidence of joint tenderness in the Plaintiff's knee, "right elbow swollen," but no swelling, heat crepitus, or scars, from prior surgery and deformity.  R. 394-95.  He also observed no problems with Plaintiff's speech and that Plaintiff seemed to understand spoken speech and responded verbally in an appropriate way.  R. 394.  Dr. Gupta also reported that Plaintiff responded appropriately to questioning, his long-term and short-term memory were intact, and his cranial nerves were within normal limits.  R. 395.  Dr. Gupta's functional analysis and observations of Plaintiff were normal.  R. 396.  Dr. Gupta provided an assessment: (1) right elbow shoulder knee pain though ROM is normal; (2) vision problems; (3) hypertension; and (4) history of HIV.  *Id.*

At the state agency's request, on June 5, 2008, Plaintiff attended a psychological disability evaluation with Earl Teller, Ph.D., a licensed clinical psychologist.  R. 388-92.  Plaintiff rode to the appointment on a bicycle.  R. 389.  Plaintiff alleged a disability due to HIV, vision problems, and headaches.  R. 388.  He reported that he grew up in a family of twelve children, his father was abusive, he had a good relationship with his siblings, and he left school in the eleventh grade because he was arrested.  R. 388.  He recounted an extensive history of incarceration; he stated that he had been jailed 98

times primarily for assault, aggravated battery, and robbery, and that he finished his last prison sentence for a bad check charge in December 2007.  R. 389.

Plaintiff reported that he had never been married, but had five children with three different women.  R. 389.  He stated that he lived with his mother and stepfather and relied on the financial support of friends and family.  *Id.*  Plaintiff reported that he worked in construction "here and there" and last worked for approximately eight months in 2004 as a forklift driver for a pool and spa company.  *Id.*  He identified his multiple incarcerations as the reason why he had not worked over the past several years.  *Id.*  Plaintiff denied a family history of psychiatric illness or a mental health treatment history, but stated that he had previously attended anger management classes and drug abuse/AA classes.  R. 390-91.  Plaintiff admitted that he liked fighting and used to abuse animals when he was young.  R. 389-90.  He acknowledged a history of drug use and explained that he had not used cocaine for the past two or three months, but he drank about one liter of gin and two six-packs of beer monthly.  R. 390.

On examination, Plaintiff appeared clean and was dressed in seasonably appropriate clothing.  R. 389.  Although Plaintiff initially provided only one-word answers, he became more open and sufficiently answered all of the "questions asked of him; however, some clinical information he provided is questionable."  *Id.*  For example, Plaintiff stated that he had hallucinations, but with no clinical substantiation.  Plaintiff reported "an atypical onset in his early 30's, with no known etiology."  *Id.*  Dr. Teller noted that "there are no other symptoms of a psychotic disorder, brain damage, organicity, or hallucinogenic drug use that could have precipitated hallucinations."  R. 390-91.  According to Dr. Teller, Plaintiff did "not meet clinical criteria

for any psychotic disorder. There is the possibility of malingering, given that he applied for disability benefits." R. 391.

Plaintiff exhibited a normal gait, normal gross motor coordination, and average intellectual functioning; he denied ever having suicidal ideation, plan or intent. R. 390-91. He spoke in coherent and grammatically correct sentences. R. 390. Plaintiff "denied ever having treatment for psychiatric problems." *Id.*

During the mental status examination, Plaintiff complained that he had a sleep disorder; reported being depressed and sad. R. 390. "On the Beck's Depression Inventory-II, a self-report assessment of depressed mood, his score placed him within the severely depressed range. He denied ever having suicidal ideation, plan, or intent. His intellectual functioning, based on his vocabulary and general fund of information, is estimated to be within the average range. As evidenced by his past criminal behavior and his statement that he likes to fight, his judgment and insight continue to be impaired." R. 391.

Dr. Teller assessed adjustment disorder with depressed mood and antisocial personality disorder; HIV positive; and assigned a current and highest Global Assessment of Functioning (GAF) score of 60. R. 391.[4] Dr. Teller recommended short-

---

[4] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners. The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id. See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale). A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family

term counseling to assist Plaintiff with dealing with his HIV status and improving his

mood; he also opined that Plaintiff could handle his own funds if he were awarded

benefits.  R. 392.  Dr. Teller also stated: "Given his chronic history of antisocial

behavior, the prognosis for any substantial change in his conduct is quite poor."  *Id.*

On June 16, 2008, Timothy Foster, Ph.D., a state agency mental health expert,

reviewed the record evidence to assess the severity of Plaintiff's alleged mental

impairments and completed a Psychiatric Review Technique (PRT).  R. 401-14.

Dr. Foster opined that Plaintiff's adjustment disorder with depression (secondary to HIV)

caused *no* limitations in Plaintiff's ability to perform daily activities; *mild* limitations in his

ability to maintain social functioning; *mild* limitations in his ability to maintain

concentration, persistence, or pace; and *no* episodes of decompensation, each of

extended duration.  R. 404, 411.  Dr. Foster explained that the record demonstrated that

Plaintiff was understandably depressed because of his HIV diagnosis, but it also

showed that Plaintiff did not allege a mental impairment when he applied for benefits,

the evidence failed to reflect severe mental functional limitations, and consultative

---

relations, judgment, thinking, or mood."  *Id.*  A GAF scale rating of 41-50 is indicative of
serious symptoms or any serious impairment in social, occupational or school
functioning.  *Id.*  A GAF scale rating of 51-60 indicates moderate symptoms or moderate
difficulty in social, occupational, or school functioning.  *Id.*  The "Commissioner has
declined to endorse the GAF scale for 'use in the Social Security and SSI disability
programs,' and has indicated that GAF scores have no 'direct correlation to the severity
requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692
n.5 (11th Cir. 2005) (unpublished) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21,
2000)).  In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for
several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide
risk, and disabilities in its descriptors) and questionable psychometrics in routine
practice.  In order to provide a global measure of disability, the WHO DSM-5 (see the
chapter "Assessment Measures")."  DSM-5 at 16.

examiner Dr. Teller identified no significant mental functional restrictions despite noting

a diagnosis of depression.  R. 413.

### 3. **Medical Evidence Submitted to the Appeals Council After the ALJ Issued His Decision**

In his Decision, the ALJ noted and emphasized that Plaintiff "reported no history

of mental health treatment."  R. 31.  This statement is substantially correct.  Plaintiff's

representative submitted a brief to the ALJ on July 12, 2010, the day before the hearing.

R. 40-41, 226-30; *see supra* n.2.  In her brief, the representative refers to records from

the Hillsborough County Health Department from 2010 as "new evidence."  R. 227-28.[5]

At the beginning of the hearing, the ALJ asked Plaintiff's representative if the file

contained all of the treatment and evaluation records that she, the representative,

reviewed on a CD.  R. 40.  The representative stated that there was "one source

outstanding, which is noted in [her] brief, which is Kenneth Cavanaugh [sic].  He's a

psych, he was on vacation all the last couple of weeks.  We have not been able to get

his records in the file yet."  The ALJ advised her to file the records as soon as possible.

*Id.*

The representative inquired of Plaintiff.  R. 42-43.  Plaintiff stated that he had

been taking Abilify for depression.  R. 49.  He was asked: "So who are you seeing for

treatment for your depression?" and Plaintiff responded "Kenneth Cavanaugh [sic]" who

Plaintiff stated "is the psychiatrist that [he sees] at the health department" and who he

had been seeing every two to three months and who prescribed two different

medications to help with his depression.  Plaintiff confirmed that the record indicated

that he had some depression previously, but that he did not receive treatment from

---

[5]  Plaintiff's representative referred to Kenneth Kavanagh as an ARNP-C, MSN, MPH, not a psychiatrist or psychologist.  R. 227, 229.

"anyone like Dr. Cavanaugh [sic]." R. 49-50. He stated he began seeing him because of his depression. He talked to his doctor who told him to start and that she would set him up with a psychiatrist at the health department. R. 50-51. When asked if he had these feelings of depression prior to seeing "Dr. Cavanaugh [sic]," he stated: "Not, well before, yes. Before I started seeing him, yes I did, and I was telling her about it. And basically I was just talking to my doctor about it." R. 50-51. Plaintiff also stated that he had side effects "[a]ll the time" from the medications taken for depression such as stopping his sex drive, making him drowsy and dizzy. R. 61. At the close of the hearing, the representative advised that she would submit the records as soon as she received them. R. 64; *see* doc. 13-1, Jan. 30, 2013, letter, regarding difficulty obtaining health department records.

Between April and June 2010, Plaintiff had three visits at the Hillsborough County Specialty Clinic for mental health complaints. R. 563-68. It appears that Plaintiff saw Mr. Kavanagh according to the hearing transcript, the representations of Plaintiff's representative, and the name "Ken" that appears on two of the patient notes. This evidence was provided to the Appeals Council. R. 6-7, 9-10, 232-35.[6]

On April 19, 2010, had a 60-minute initial mental health evaluation at the Hillsborough County Specialty Clinic. R. 566. The evaluator's name is difficult to read, although the first name appears to be "Ken." *Id.* Plaintiff reported depression since 2005 and was "getting worse." *Id.* He also reported hopelessness, guilt, isolation, low

---

[6] On March 22, 2010, Plaintiff was examined and treated at the *Hillsborough County Health Department Specialty Care Center* by Janice Varda, ARNP. R. 496-97. Plaintiff's chief complaints were night sweats, neuropathy, and pain of seven on a ten-point scale. R. 496. Plaintiff reported feeling good, although there is mention of "future appts-chronic pain." R. 496-97. A physical exam indicated normal findings. *Id.* It was noted that Plaintiff wanted to "start meds." R. 496. There is also a note: "mental health referral-pt request-dealing č diagnosis" with a date of 4/19/10. R. 497.

energy and libido, very nervous, panic state, and afraid to be alone. *Id.* Plaintiff denied

suicidal and homicidal ideations, mania, and obsessive compulsive tendencies, but

reported that he had been having auditory and visual hallucinations since 2005. *Id.* He

stated that he lived with his girlfriend and her kids. *Id.* Plaintiff reported that he was in

jail over 30 times and was having a hard time transitioning to regular life. *Id.* He denied

taking any psychiatric medication. He reported a long history of fighting and bad temper

beginning in his 20's. *Id.*

On examination, Plaintiff appeared alert and oriented times three. R. 567. He

had a linear, logical thought process at times, although he was "very stuck in negativity;"

fair eye contact; poor insight and judgment; intact attention and concentration; a fairly

well groomed appearance; and a nervous and depressed mood and affect. *Id.* The

evaluator noted that Plaintiff was a poor historian especially about timelines. *Id.* The

evaluator assessed a working diagnosis of major depressive disorder, severe with

psychotic symptoms and rule/out anti-social personality disorder. *Id.* The evaluator

noted that Plaintiff's medication regimen would likely be adjusted at his next visit. *Id.*

Lexapro was prescribed with a note that Abilify and another medication would likely be

added. *Id.*[7]

At a follow-up visit on May 17, 2010, at the Hillsborough County Specialty Clinic,

Plaintiff reported no changes in his depression or anxiety symptoms; he complained of

continued hallucinations, but denied suicidal/homicidal ideations or mania. Again, the

---

[7] On April 23, 2010, ARNP Varda, at the Hillsborough County Health Department Specialty Care Center, noted Plaintiff's chief complaints of night sweats and neuropathy; zero pain; feeling good; and ready to start meds. R. 494. Physical exam results were normal. *Id.* On May 10, 2010, ARNP Varda noted no chief complaints and zero pain; "feels good" and "taking meds." R. 492. Plaintiff's neuropathy improved. R. 493. On June 9, 2010, ARNP Varda noted no complaints; two on the ten point scale for pain; "feels good" and "taking meds." Physical exam results were normal. R. 490.

evaluator's name appears to be "Ken." R. 565. The evaluator noted no changes with respect to Plaintiff's mental status, the dose of Lexapro was increased, and Abilify was added. *Id.*

On June 7, 2010, during a 30-minute visit at the Hillsborough County Specialty Clinic, Plaintiff reported no changes in his depression or psychotic symptoms, and the evaluator again noted no changes in Plaintiff's mental status. The evaluator's name is unreadable; initials are provided. R. 564. The evaluator adjusted (increased) Plaintiff's dosages of Lexapro and Abilify and noted that different medications could be tried if Plaintiff did not experience improvement in his symptoms. *Id.* It was noted that Plaintiff requested to follow-up in ten weeks. *Id.*

### C. Substantial evidence supports the ALJ's determination that Plaintiff does not have a severe mental impairment affecting his ability to work

1.

Plaintiff argues that the ALJ erred in not explicitly stating the weight he assigned to the consultative psychological examiner's (Dr. Teller's) opinion which, according to Plaintiff, was contrary to the ALJ's finding that Plaintiff did not a have a severe mental impairment, and further that this impairment should have been included in the ALJ's RFC assessment. According to Plaintiff, Dr. Teller's examination and assessment described, at the very least, a severe mental impairment. Doc. 13 at 2, 5-10.

At step 2, the issue is whether the claimant has shown that he or she has a condition that has more than "a minimal effect on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc." Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521). To be considered "severe," a medical condition must constitute more than a "deviation from purely medical standards of bodily

perfection or normality." <u>McCruter v. Bowen</u>, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[F]or an impairment to be non-severe, 'it [must be] a slight abnormality which has such

a minimal effect on the individual that it would not be expected to interfere with the

individual's ability to work, irrespective of age, education, or work experience.'" <u>Parker</u>

<u>v. Bowen</u>, 793 F.2d 1177, 1181 (11th Cir. 1986), *citing* <u>Brady v. Heckler</u>, 724 F.2d 914,

920 (11th Cir. 1984), <u>Edwards v. Heckler</u>, 736 F.2d 625, 630 (11th Cir. 1984), and

<u>Flynn</u>, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows only claims based

on the most trivial impairments to be rejected.  The claimant's burden at step two is

mild. . . .Claimant need show only that her impairment is not so slight and its effect is

not so minimal." <u>McDaniel v. Bowen</u>, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying

<u>Brady</u>).  It was been said that step two of the sequential analysis may do no more than

screen out de minimus claims.  <u>Stratton v. Bowen</u>, 827 F.2d 1447, 1453 (11th Cir.

1987).  The ALJ is not required, however, to identify all of the impairments that should

be considered severe.  *See* <u>Heatly v. Comm'r of Soc. Sec.</u>, 382 F. App'x 823, 825 (11th

Cir. 2010) (unpublished).

　　　　Here, at step two, the ALJ determined that Plaintiff had severe impairments:

"osteoarthritis of the right knee and HIV."  R. 30.  The ALJ concluded that these

medically determinable physical impairments "are 'severe' within the meaning of the

regulations because they significantly limited the claimant's ability to perform basic work

activities."  R. 31.  The ALJ also considered other alleged impairments such as

headaches, complaints of adjustment disorder, anti-social personality disorder, and

others, and found that they "do not cause more than minimal limitation in the [Plaintiff's]

ability to perform basic work activities and [are] therefore non-severe." *Id.*

The ALJ stated he considered the four broad functional "paragraph B" criteria, and ultimately determined that Plaintiff had *no* limitations in activities of daily living; *no* limitations in social functioning; and *mild* limitations in concentration, persistence or pace;[8] and *no* episodes of decompensation which have been of extended duration. R. 31. The ALJ correctly stated that the limitations identified in the paragraph B criteria are not a RFC assessment, but are used to rate the severity of mental impairments at steps two and three. R. 32.

Under his step two analysis, the ALJ emphasized that Plaintiff "reported that he had no history of mental health treatment. "Additionally, both State Agency psychological consultants found the claimant's mental impairments to be non[-]severe." R. 31.[9]

The ALJ determined that Plaintiff had the RFC to perform the full range of light work. R. 32. As noted above, the ALJ found that Plaintiff had no severe mental impairment and, as a result, included no mental limitations in his RFC limitations. The

───────────────────

[8] The ALJ also stated: "Upon examination, the claimant's intellectual functioning was estimated to be within the average range, but his judgment and insight appeared to be impaired." R. 31; *see* R. 391. Dr. Teller noted that Plaintiff's judgment and insight were impaired given his past criminal behavior and statement that he liked to fight. R. 391. Notwithstanding, over time, Plaintiff's examiners reported that he was alert and oriented, R. 372, 376, 378, 415, 417, 419, 421, 436, 438, 440, 440, 490, 492, 494, 496, 499, 517, 519, 521, 523, 525, 527, 529, 531, 533, 535, responded appropriately to questioning although some clinical information provided was questionable, and he exhibited average intelligence, although Plaintiff's long-term and short-term memory were intact. R. 389-91, 395. Plaintiff also admitted that he had no problems concentrating or finishing tasks. R. 170.

[9] This appears to be a reference to the consultative psychological examination by Dr. Teller, R. 34, 388-92, and Dr. Foster's record review of Plaintiff's alleged mental impairments. R. 35, 401-14.

ALJ ultimately determined that Plaintiff was capable of performing jobs that exist in
significant numbers in the national economy.  R. 36.

In determining Plaintiff's RFC, the ALJ considered the relevant evidence such as
treatment records from 2005 to 2010.  R. 33-35.  The ALJ provided a brief summary of
Dr. Teller's findings, R. 33, although the ALJ also relied on Dr. Teller's findings when he
determined Plaintiff had *mild* limitations in the functional areas of concentration,
persistence, or pace.  R. 31.

As noted above, the ALJ properly applied the special technique set forth in the
regulations when analyzing the severity of Plaintiff's alleged mental impairments, R. 31-
32.  20 C.F.R. § 416.920a (explaining how mental impairments should be evaluated).
Substantial evidence supports the ALJ's determination that Plaintiff's alleged mental
impairments did not cause more than minimal limitations in Plaintiff's ability to perform
basic mental work activities and, therefore, were non-severe.  R. 31; *see* 20 C.F.R.
§ 416.920a(d)(1) (explaining a claimant's mental impairment(s) will generally be
considered non-severe when the degree of limitation in the first three functional areas is
"none" or "mild" and "none" in the fourth area).

In addition, the ALJ noted that his step two finding was also supported by
Dr. Foster, a state agency mental health expert consultant, who reached the same
conclusion based on his review of the record.  R. 31, 401-14.  Dr. Foster explained the
record demonstrated that Plaintiff was understandably depressed because of his HIV
diagnosis, but it also showed that Plaintiff did not allege a mental impairment when he
applied for benefits.  R. 413.  Also, the evidence did not reflect mental functional
limitations, and consultative examiner Dr. Teller identified no mental restrictions despite

noting a diagnosis of adjustment disorder with depressed mood and antisocial personality disorder, conditions that the ALJ noted as medially determinable impairments, yet non-severe.  R. 388-92, 431, 434; *see* <u>Jones v. Sullivan</u>, 954 F.2d 125, 129 (3d Cir. 1991) (disability is not determined merely by the presence of impairments, but rather on the functional restrictions the impairments have on the individual).

Notwithstanding, Plaintiff argues that the ALJ's step two analysis was flawed because Dr. Teller's examination report purportedly established that his mental impairments were severe.  Doc. 13 at 7-10.  Aside from Dr. Teller's diagnoses and his report that Plaintiff's judgment and insight were impaired, a factor noted by the ALJ at step two, R. 31, Dr. Teller did not identify significant mental restrictions resulting from Plaintiff's impairments.  R. 388-92.  Dr. Teller's report revealed that Plaintiff had a good relationship with his siblings; he lived with his mother and stepfather and relied on the financial support of friends and family; he identified his multiple incarcerations as the reason why he had not worked over the past several years; Plaintiff was potentially a malingerer; and on mental status examination, Plaintiff exhibited proper hygiene and grooming, average intellectual functioning, clear speech, and no suicidal ideation, plan, or intent.  R. 388-92.  Dr. Teller's consultative examination report did not establish that Plaintiff's mental conditions significantly limited his ability to perform basic mental work activities.

Plaintiff also argues that the ALJ erred and remand is required because the ALJ did not assign any particular weight to Dr. Teller's report even though the ALJ discussed his report in his decision.  Doc. 13 at 5-7.  The ALJ considered the material portions of

Dr. Teller's report. R. 31, 34. The ALJ stated that Dr. Teller and Dr. Foster, the state agency psychological consultants, "found the claimant's mental impairments to be non[-]severe." R. 31. The ALJ stated he "relied heavily on the opinions of State agency consultants," implicitly Drs. Teller and Foster, "because no treating source of record rendered a medical source statement." R. 35. The ALJ also expressly gave "great weight" to Dr. Foster's opinion "because he is a mental health specialist." R. 35.

The record indicates that the ALJ sufficiently considered and discussed Dr. Teller's findings. Plaintiff told Dr. Teller that he had no history of psychiatric treatment but he reported an extensive history of incarcerations, a history of drug and alcohol use, and a history of auditory and visual hallucinations. R. 34. The ALJ accurately stated that Dr. Teller reported that there was a possibility that Plaintiff was malingering. *Id.*; *see* R. 391 and *infra* n.12. The ALJ also noted that Dr. Teller's diagnostic impressions were adjustment disorder with depressed mood and antisocial personality disorder. R. 34. The ALJ found that Plaintiff had *mild* limitations in concentration, persistence, or pace, relying on Dr. Teller's assessment that Plaintiff's intellectual functioning was estimated to be within the average range, but his judgment and insight appeared to be impaired. R. 31. Although Dr. Teller assigned Plaintiff a GAF score of 60, R. 391, *see supra* n.4, there is no evidence that this score reflected Dr. Teller's opinion about Plaintiff's functional abilities. There is no evidence in the record that Dr. Teller opined that Plaintiff had mental functional restrictions such that he was not capable of working. (The ALJ also found at step three that no state agency medical consultant determined that Plaintiff's impairments meet the criteria of any listing. R. 32.)

Notwithstanding the above, the ALJ concluded that Plaintiff could perform the minimal mental demands of unskilled work when he applied the Medical-Vocational Rules ("grids") to determine that Plaintiff was not disabled.  R. 36 ("Based on a [RFC] for the full range of light work, considering the claimant's age, education, work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 202.17.  Even assuming for argument's sake that the claimant's past relevant work was semi-skilled or skilled, a finding of "not disabled" will be directed by Medical-Vocational Rules 202.18 and 202-19.")  *See* 20 C.F.R pt. 404, subpt. P, app. 2, §§ 201.00(a), 202.00(a), 203.00(a) (explaining that all of the occupations considered by the grid rules are unskilled).  Unskilled work, by definition, requires little or no judgment to do simple duties that can be learned on the job in a short period of time.  20 C.F.R. § 416.968(a).  A person can usually learn to do unskilled work after a short demonstration or within 30 days.  20 C.F.R. § 416.968(a); 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.00.  It neither requires special skills or experience nor imparts work skills; in fact, little specific vocational preparation and judgment are required to perform unskilled work.  *Id.*  Furthermore, unskilled jobs generally provide substantial vocational opportunity for persons with mental impairments.  Social Security Ruling (SSR) 85-15, 1985 WL 56857 at *4.  Plaintiff has not demonstrated that his mental impairments caused greater functional restrictions beyond a limitation to unskilled work.  As a result, the ALJ's RFC determination should not be disturbed.

2.

Plaintiff argues that the evidence submitted to the Appeals Council was material and should have caused the Appeals Council to remand the matter to the ALJ because

it directly contradicted the ALJ's statement in support of the non-severity finding that

Plaintiff had no history of mental treatment and established a level of impairment

consistent with that described by Dr. Teller.  Doc. 13 at 10-13.  Plaintiff also argues that

the case should be remanded for further consideration because the Appeals Council

provided no rationale to support for its rejection of the new evidence provided to the

Appeals Council after the ALJ's decision.  R. 232-35, 564-68; Doc. 13 at 10-13.  The

Commissioner suggests that the Appeals Council "carefully considered the additional

evidence and reasonably determined that the evidence provided no basis for changing

the ALJ's decision" and that the evidence was not material.  Doc. 17 at 19-22.

> Generally, a claimant is allowed to present new evidence at each stage of this administrative process.  See 20 C.F.R. §§ 404.900(b), 416.1470(b); Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1261 (11th Cir. 2007).  The Appeals Council has the discretion not to review the ALJ's denial of benefits. 20 C.F.R. §§ 404.970(b), 416.1470(b).  However, the Appeals Council must consider "new and material evidence" that "relates to the period on or before the date of the [ALJ] hearing decision" and must review the case "if the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record."  Id.  The new evidence is material, and thus warrants a remand, if "there is a reasonable possibility that the new evidence would change the administrative outcome."  Hyde v. Bowen, 823 F.2d 456, 459 (11th Cir. 1987).

Flowers v. Comm'r of Soc. Sec., 441 F. App'x 735, 745 (11th Cir. 2011) (unpublished).

The Flowers court also stated that "[w]hen a claimant presents new evidence, and the

Appeals Council denies review, the Appeals Council must show in its written denial that

is has adequately evaluated the new evidence," citing Epps v. Harris, 624 F.2d 1267,

1273 (5th Cir. 1980).  Flowers, 441 F. App'x at 745.  The Court further stated that "[i]f

the Appeals Council merely 'perfunctorily adhere[s]' to the ALJ's decision, the

Commissioner's findings are not supported by substantial evidence and we must

remand 'for a determination of [the claimant's] disability eligibility reached on the total

record." *Id.* The court concluded that the Appeals Council did not adequately consider the claimant's new evidence. *Id.* The court, however, went forward and addressed whether there was a reasonable possibility that the claimant's new evidence would change the ALJ's decision. *Id.* (The "reasonable possibility" standard is derived from Hyde v. Bowen, 823 F.2d at 459.)

Notwithstanding the alleged procedural irregularity concerning the Appeals Council's lack of a detailed explanation for rejecting the new evidence, this Court's consideration of the new evidence is consistent with Ingram's teaching that "when a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." Ingram, 496 F.2d at 1262. "Thus, because a reviewing court must evaluate the claimant's evidence anew, the [Appeals Council] is not required to provide a thorough explanation when denying review." Burgin v. Comm'r of Soc. Sec., 420 F. App'x 901, 903 (11th Cir. 2011) (unpublished) (finding Appeals Council considered and incorporated additional evidence, which had little probative weight, and was not required to explain its denial of review), citing Ingram, 496 F.3d at 1261; compare with Flowers, 441 F. App'x at 746 (remanding because the Appeals Council did not articulate specific findings when the new evidence was from treating physician and contained an RFC assessment "that was supported by significant clinical findings from three examinations performed" by treating physician).

In 2010, the court reviewed several Eleventh Circuit cases following Ingram and concluded that "the Eleventh Circuit has undertaken its own review of the entire record to determine 'whether that new evidence renders the denial of benefits erroneous.' . . .

It appears, therefore, that the Eleventh Circuit has implemented Ingram by asking, upon review of all of the evidence (including the new evidence), whether the Commissioner's path to his decision may be reasonably discerned. If it can be discerned, then the court must determine whether the decision is supported by substantial evidence." Keene v. Astrue, Case No, 5:09cv192-SPM/WCS, 2010 U.S. Dist. LEXIS 60010, at *41-42 (N.D. Fla. May 20, 2010) (citations omitted), report and recommendation adopted, 2010 U.S. Dist. LEXIS 600067 (N.D. Fla. June 16, 2010). The court rejected "the more technical claim presented by Plaintiff" that the Appeals Council erred by not discussing the new evidence, the same issue raised by Plaintiff here. 2010 U.S. Dist. LEXIS 60010, at *42.[10]

---------------------

[10] In relatively recent cases, the court rejected plaintiffs' arguments that the Appeals Council did not adequately explain its rationale for rejecting new evidence and implicitly rejected a rule of per se reversal. In the cases, the court determined whether the "new evidence rendered the denial of benefits erroneous" and, therefore, whether a remand was appropriate, quoting Ingram, 496 F.3d at 1262. McCartt v. Astrue, Case No. 3:11cv217/EMT, 2012 U.S. Dist. LEXIS 126365, at *42 (N.D. Fla. Sept. 6, 2012); Wilder v. Astrue, Case No. 3:10cv528/MCR/EMT, 2011 U.S. Dist. LEXIS 150777, at *13-14, 16-20 (N.D. Fla. Dec. 5, 2011), report and recommendation adopted, 2012 U.S. Dist. LEXIS 1840 (N.D. Fla. Jan. 6, 2012); McNeil v. Astrue, Case No. 3:10cv371/RV/EMT, 2011 U.S. Dist. LEXIS 138250, at *30-32, 34-39 (N.D. Fla. Nov. 1, 2011), report and recommendation adopted, 2011 U.S. Dist. LEXIS 138248 (N.D. Fla. Nov. 30, 2011). But see Freudenvoll v. Comm'r of Soc. Sec., Case No. 6:12-cv-467-Orl-22GJK, 2013 U.S. Dist. LEXIS 13218, at *28-40 (M.D. Fla. Jan. 9, 2013), report and recommendation adopted and objections overruled, 2013 U.S. Dist. LEXIS 13219 (M.D. Fla. Jan. 31, 2013). In Freudenvoll, the District Judge adopted the legal reasoning and factual findings of the Magistrate Judge, when he concluded that under binding precedent of the Eleventh Circuit, as in Flowers, 441 F. App'x 735, which cited to Epps v. Harris, the Appeals Council "merely perfunctorily adhered to the ALJ's decision" by not explaining its rejection of the new evidence and, as a result, its decision was not supported by substantial evidence. Freudenvoll, 2013 U.S. Dist. LEXIS, * at 5-7. The District Judge rejected the Commissioner's argument that Flowers, and necessarily Epps, was not persuasive. Id. at *6-7. Here, Plaintiff relies on Flowers and Epps to support his argument that the Appeals Council erred when it rejected Plaintiff's new evidence without explaining the basis for rejecting the new evidence. Plaintiff also

The Appeals Council considered the additional evidence and reasonably determined that the evidence provided no basis for changing the ALJ's decision.  R. 6-7. This Court has reviewed the entire Record and conducted a meaningful review of the new evidence based on the information contained in the ALJ's report and, therefore, the absence of an explicit statement by the Appeals Council does not constitute reversible error.  Burgin v. Comm'r of Soc. Sec., 420 F. App'x at 903.  Even if the Appeals Council's rejection of the new evidence is insufficient, there is no reasonable possibility that the new evidence would change the ALJ's decision.

In particular, the additional evidence consisted of three mental health treatment notes from Hillsborough County Specialty Clinic dated April 19, 2010; May 17, 2010; and June 7, 2010.  R. 563-68; *see supra* at 16-19.  According to statements made by Plaintiff's representative, Plaintiff was evaluated and treated by Mr. Kavanagh in April, May, and June 2010.  R. 227, 229; *see supra* at 16-19.  It does not appear, however, that Mr. Kavanagh is an acceptable medical source such as a licensed physician or licensed or certified psychologist or the like.  20 C.F.R. § 416.913(a)(1)-(2).  Nurse-practitioners are considered "other sources."  20 C.F.R. § 416.913(d)(1).  "Accordingly, an ARNP's opinion is not entitled to the same weight as afforded the opinion of a treating psychiatrist or psychologist.  Cf. Falge v. Apfel, 150 F.3d 1320, 1324 (11th Cir. 1998)."  Osterhoudt v. Astrue, Case No. 8:10-CV-336-T-TGW, 2011 U.S. Dist. LEXIS 5781, at *7 (M.D. Fla. Jan. 14, 2011).

Notwithstanding, in addition to evidence from listed acceptable medical sources, the Commissioner "may also use evidence from other sources [such as an ARNP] to

argues that the new evidence is material and, as a result, there is a "reasonable possibility" that the new evidence would change the ALJ's decision.  Doc. 13 at 10-13.

show the *severity* of [a claimant's] impairment(s) and how it affects [their] ability to work." 20 C.F.R. § 416.913(d) (emphasis added). Although this new evidence may be considered by the Commissioner, the ALJ, and this Court, the Plaintiff cannot rely upon the principle regarding the special weight to be given the opinion of a treating physician, psychiatrist, or psychologist. Osterhoudt v. Astrue, 2011 U.S. Dist. LEXIS 5781, at *7. At best, aside from providing new evidence regarding prescribed medications, the new evidence provides cumulative information regarding Plaintiff's reported depression. The new evidence does not expressly explain the severity of Plaintiff's depression or how his depression affects Plaintiff's ability to work.

The records (new evidence) revealed in part: Plaintiff denied suicidal and homicidal ideations, mania, and obsessive compulsive tendencies, but reported that he had been having auditory and visual hallucinations since 2005, R. 566[11]; he lived with his girlfriend and her kids whom he cared for "a lot," *id.*; he admitted that he was having a hard time transitioning to regular life, *id.*; and he denied taking any psychiatric medications, *id.*; on mental status examinations, he was alert and oriented times three with a linear, logical thought process; fair eye contact; poor insight and judgment; intact attention and concentration; a fairly well groomed appearance; and a nervous and depressed mood and affect, R. 567; and he was prescribed medication. R. 564-65, 567.

To be considered material, the new evidence must have created a reasonable possibility that the administrative outcome would be changed. Hyde v. Bowen, 832 F.2d at 459. The new evidence here is not material for several reasons. One, the records

--------

[11] Dr. Teller opined that Plaintiff's claims about hallucinations were "questionable" and he suspected that Plaintiff could be malingering. R. 391.

did not establish that Plaintiff's mental conditions significantly impacted his work-related abilities, let alone caused work-preclusive limitations. R. 563-68. As noted, the evaluator identified no specific work-related limitations and documented relatively unremarkable mental status findings. *Id.* Two, the records did not provide additional insight into Plaintiff's conditions and were cumulative of the information contained in Dr. Teller's report, which the ALJ considered. Three, because the records span a period of only three months, they do not establish that Plaintiff's mental conditions met the durational requirement of the Social Security Act. 20 C.F.R. § 416.920(a)(4)(ii) (stating that severe impairments must also meet durational requirement). Four, the records do not demonstrate that Plaintiff did not have the mental capacity to perform the minimal mental demands of unskilled work as found by the ALJ. R. 563-68. And, five, Plaintiff was contemporaneously receiving medical assistance (at the same time he was receiving mental health evaluation and treatment, R. 227, 229) at the Hillsborough County Health Department Specialty Care Center from January to June 2010. R. 488-99; *see supra* n.7. In particular, the treatment notes from April to June 2010, R. 490-95, indicate that Plaintiff generally felt good, reported slight to no pain, was ready to take meds and taking meds. Also, generally normal findings were reported after physical exams. *Id.*

Plaintiff claims that the additional records are material because they contradict the ALJ's statement in support of his step two finding that Plaintiff had "no history of mental health treatment." Doc. 13 at 11. This argument is not persuasive. The ALJ identified additional support for his non-severity finding besides the absence of specialized mental health treatment. R. 31. Specifically, the ALJ cited the opinion of

state agency mental health expert Dr. Foster, Plaintiff's self-reported abilities and activities, and the mental status findings of record to support his step-two finding. *Id.* Thus, while the records counter the ALJ's statement that Plaintiff did not receive specialized mental health treatment during the relevant period--a statement that was accurate given the record before the ALJ--they do not render the ALJ's step-two finding unsupported by substantial evidence.

Plaintiff's claim that the additional evidence confirms Dr. Teller's assessment that Plaintiff's mental conditions were severe also lacks merit. Doc 13 at 11. As discussed previously, Dr. Teller's report did not establish that Plaintiff's mental conditions significantly limited his work-related abilities. R. 388-92. In any event, as already noted, the new evidence did not prove that Plaintiff did not have the mental capacity to perform the minimal mental demands of unskilled work as found by the ALJ. R. 563-68.

Based on the foregoing, there is no reasonable possibility that the 2010 mental health records would have changed the administrative result, here, the ALJ's decision. *See* Robinson v. Astrue, 356 F. App'x 993, 996 (11th Cir. 2010) (unpublished) (quoting Milano v. Bowen, 809 F.2d 763 (11th Cir. 1987)). Accordingly, the Appeals Council did not err in not remanding Plaintiff's case to the ALJ to consider the new evidence.

## V.  Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and he correctly applied the law. Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner

to deny Plaintiff's application for SSI be **AFFIRMED** and that judgment be entered for

Defendant.

     **IN CHAMBERS** at Tallahassee, Florida, on July 31, 2013.


               <u>s/  Charles A. Stampelos</u>
               **CHARLES A. STAMPELOS**
               **UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

     **A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**